In re GREAT WESTERN COAL, INC.;
Great Western Land Management, Inc.;
Harlan Fuel Company; Great Western
Coal (Kentucky), Inc., Debtors.

GREAT WESTERN COAL, INC. and
Great Western Coal (Kentucky),
Plaintiffs,

v.

Mary P. BROWN, Clerk of the Court
for Berkeley County, South
Carolina, Defendant.

Bankruptcy Nos. 92–43375–H3–11, 92–
43377–H3–11, 92–43378–H2–11 and
92–43376–H4–11.
Adv. No. 92–4232.

United States Bankruptcy Court,
S.D. Texas,
Houston Division.

May 6, 1992.

Patrick L. Hughes, Sheinfeld, Maley & Kay, Houston, Tex., for plaintiff Great Western Coal, Inc.

Daniel H. Johnston, Jr., Baker, Brown, Sharman & Parker, Houston, Tex., Henry J. White, Office of South Carolina, Atty. Gen., Columbia, S.C., for defendant.

## ORDER GRANTING INJUNCTIVE RELIEF

KAREN KENNEDY BROWN, Bankruptcy Judge.

Great Western Coal, Inc. and Great Western Coal (Kentucky), Inc., plaintiffs

and debtors in this adversary proceeding, filed an emergency motion to compel turnover of funds in excess of $34,000,000 held in the registry of the Clerk of Court for Berkeley County, South Carolina, Mary P. Brown. This is a core proceeding pursuant to 28 U.S.C. § 157(b)(2)(E), with jurisdiction provided under 28 U.S.C. § 1334, § 157(a), and this district's general order of reference.

On April 10, 1992, debtors (along with two other related entities) filed voluntary petitions under Chapter 11 of the Bankruptcy Code. A motion to jointly administer all cases was granted. Each of the debtors are operating as debtors-in-possession under 11 U.S.C. § 1108.

After debtors filed for bankruptcy, they made demand upon Ms. Brown for turnover of the funds held pursuant to two writs of attachment obtained by the South Carolina Public Service Authority (commonly referred to as "Santee Cooper") against the debtors. A second letter was sent on April 15, 1992, and after receiving no response from the Clerk, debtors commenced this adversary proceeding.

This adversary proceeding and the motion for turnover pertaining thereto were brought solely against Ms. Brown. The Attorney General for the State of South Carolina made a limited appearance to prosecute her motion to dismiss on Eleventh Amendment grounds. Santee Cooper also made a limited appearance through counsel to raise the same Eleventh Amendment immunity defense. Citibank, the debtors' major secured lender with an alleged lien on substantially all of the assets of the debtors, including the funds held in the Clerk's registry, appeared in support of debtors' motion to compel turnover.

■ The Attorney General on behalf of Ms. Brown has moved to dismiss on grounds of insufficiency of service of process, citing F.R.Civ.P. 4(d)(6). Rule 4(d)(6) requires personal service on the "chief executive officer" of a governmental organization subject to suit or service as prescribed under state law. Debtors failed to personally serve Ms. Brown, who is certainly the "chief executive officer" of the Clerk

of Court for Berkeley County, and failed to effect service under South Carolina law.

Rule 4(d)(6), however, must be read together with Rule 7004 of the Federal Rules of Bankruptcy Procedure. *See* FRBP 7004(a). FRBP 7004(b) permits service "within the United States by first class mail." FRBP 7004(d) authorizes nationwide service of process of the summons and complaint. Service upon Ms. Brown was made by facsimile, Federal Express delivery, and first class mail. The Attorney General has not argued that FRBP 7004 is unconstitutional. Due process was clearly served.

Debtors at this juncture do not seek use of but only transfer of the funds held in the Clerk's registry with all competing liens, claims, encumbrances, or rights of any party attaching thereto. Since Santee Cooper has not been joined, this request for Order compelling turnover in no way prejudices its rights and claims to those funds. This Court, however, must determine as between the parties to this adversary proceeding: the debtors, the Clerk, and Citibank, whether the funds are property of the estate for purposes of determining whether under Section 345 the funds are adequately protected and whether those funds would be better served in the registry of the Clerk of the Court of the Southern District of Texas.

Nevertheless, the Attorney General for the State of South Carolina on behalf of Ms. Brown and Santee Cooper argue vigorously that this Court cannot determine whether those funds in the Clerk's registry are property of the estate under Section 541. They maintain that this Court is limited to looking solely to the adequacy of the security of those funds under Section 345. The defendant and those parties aligned with the defendant misconstrue the nature of the complaint and the relief debtors seek. Debtors seek turnover of *property of the estate*, based primarily, but not exclusively, on Section 345. This Court could not order turnover unless it found that the funds were in fact property of the estate at least as between the parties to this adversary proceeding. Santee Cooper in any

subsequent proceeding will not be foreclosed from arguing its assertion that the funds are not property of the estate. The Court will therefore proceed on that basis with its analysis of the complex issues presented in this litigation.

I.

### Whether the Funds in the County Clerks Registry are Property of the Estate and Thus Subject to Turnover

As noted, this Court must first determine whether the funds in the Clerk's registry are property of the debtors' estate and subject to mandatory injunction for prospective relief in the nature of a turnover order under Sections 542 and 543 of the Bankruptcy Code. At a hearing held on April 23, 1992, to determine whether permanent injunctive relief should be granted, debtors offered testimony and exhibits with respect to ownership of the funds held in the Clerk's registry.

Debtors and Santee Cooper have had a contractual relationship since 1978. Debtors delivered coal pursuant to this contract. Sometime in April of 1991, Santee Cooper began to deposit in the Clerk's registry amounts due for debtors' periodic coal deliveries. Santee Cooper sued debtors, its own officer, and an officer of the debtors on various fraud theories. Thereafter, Santee Cooper initiated a prejudgment attachment proceeding under South Carolina law. *See* S.C.Code Ann. § 15–19–10 et seq. (1976). Santee Cooper obtained two prejudgment attachment orders, the validity of which are on appeal to the South Carolina Supreme Court. The attachment orders now extend to the entire res of over $34,-000,000 in the Clerk's registry. As required under the statute, Santee Cooper posted a bond in a de minimis amount. Santee Cooper subsequently increased its prejudgment bonds, which now total at least $12,000,000.

■ 11 U.S.C. § 541(a) provides that property of the estate "is comprised of all the following property, wherever located and by whomever held: ... all legal or equitable interests of the debtor in proper-

ty as of the commencement of the case." Crucial to this case is the general rule that Section 541 includes as property of the estate any property made available to the estate by other provisions of the Bankruptcy Code. *United States v. Whiting Pools, Inc.*, 462 U.S. 198, 203, 103 S.Ct. 2309, 2313, 76 L.Ed.2d 515, 520 (1983).

■ Sections 542 and 543 are such provisions. Section 542(a) requires a noncustodial entity holding property that a debtor-in-possession can use under Section 363 to turn such property over to the debtor-in-possession. Section 543 requires a custodian (subject to exceptions not relevant here) to deliver to the debtor-in-possession "any property of the debtor held by or transferred to such custodian." 11 U.S.C. § 543(b)(1). The Clerk is certainly a custodian under Section 101(10), and at least one court has so held. *See In re Vescovo*, 125 B.R. 468 (Bankr.W.D.Tex.1990).

To the extent that Section 106(c) constitutes a Congressional restriction on a state's right to assert Eleventh Amendment immunity, Section 542 contains the necessary trigger word "entity" for Section 106(c) to be invoked. *See* 11 U.S.C. §§ 106(c)(1) and 101(27) ("governmental unit" means state or municipality); *see also* this opinion, *infra*, pp. 709–11. Section 543, however, contains none of the necessary trigger words under Section 106(c)(1) to invoke a waiver of sovereign immunity as to a state or arm thereof. To the extent that the Clerk has no sovereign immunity to be limited, however, Section 543 would obviously apply.

■ The debtors' ownership of the funds is shown by Santee Cooper's deposit of funds in the Clerk's registry, deposits that resulted directly from payments demanded by the debtors upon their submission of invoices for deliveries of coal under its contract with Santee Cooper. Santee Cooper's unliquidated claims against the debtors, however meritorious, do not change these facts. Santee Cooper's claims to ownership of these specific funds were extinguished upon its deposit of those funds into the Clerk's registry and its prejudg-

ment attachment of those funds to satisfy any judgment it might ultimately receive.

This would arguably be a different case if Santee Cooper had not chosen the trial strategy of pretrial attachment and had retained these funds due on the contract in its own accounts. Nevertheless, the funds now in the Clerk's registry are not funds in the state's coffers. Instead, these funds are a specific, identifiable, and traceable fund or res, segregated either from other funds in the Clerk's registry or funds held generally in any accounts in the control of Santee Cooper.

▮ Attachment under South Carolina law presumes that the property or res to be attached is property of the party subject to the remedy of attachment. *See* S.C.Code Ann. § 15–19–10 et seq. (1976); *Harrison v. Morris*, 370 F.Supp. 142 (D.S.C.1974). An attachment proceeding by its very nature deprives the defendant of the lawful use and possession of its own property until such time as the defendant either obtains a favorable judgment or posts a redelivery bond. *Harrison v. Morris*, 370 F.Supp. at 147. The very purposes underlying the remedy of prejudgment attachment are to induce the defendant to appear at trial on the merits of the plaintiff's underlying action and to provide security for the satisfaction of any forthcoming judgment. *Id.* at 146–47. In a prejudgment proceeding, the plaintiff upon initiating a prejudgment attachment proceeding must post a bond and file an affidavit setting forth the basis for its attachment of defendant's property. *See* S.C.Code Ann. § 15–19–50 to 15–19–90 (1976). It is highly questionable that Santee Cooper would post a bond on its own property.

▮ The effect of an attachment is to create a lien or encumbrance on the property attached, with the lien being perfected only upon the plaintiff obtaining a judgment against the property attached. *Harrison v. Morris*, 370 F.Supp. at 148–49. Consequently, without prejudging the issue in the absence of all parties, Santee Cooper, were it before this Court, would arguably appear to have at most an inchoate lien on the property in the Clerk's registry to se-

cure any judgment it may ultimately obtain against the debtors.

Numerous Fifth Circuit cases uphold the propriety of turnover of property of the estate held by a third party who either claims an interest in the funds or hold funds subject to competing claims. *See Georgia Pacific Corp. v. Sigma Service Corp.*, 712 F.2d 962 (5th Cir.1983); *In re Quality Holstein, Inc.*, 752 F.2d 1009 (5th Cir.1985); *Matter of Samuels*, 526 F.2d 1238 (5th Cir.1976). Ms. Brown claims no interest in the funds in her registry, and her legal relationship to those funds is that of a neutral stakeholder. To the extent of the evidence before this Court, Santee Cooper has nothing more than a prepetition unadjudicated claim and an inchoate lien on the funds in the Clerk's registry. Putting the Eleventh Amendment immunity issue aside, Santee Cooper simply appears to be another creditor with a claim against the estates of debtors. Although the Attorney General for the State of South Carolina and counsel for Santee Cooper have argued that under South Carolina's prejudgment attachment statute Santee Cooper retains ownership to the funds in the Clerk's registry, they offer no authority for that novel proposition.

▮ Therefore, as between the parties to this adversary proceeding, the Clerk, debtors, and Citibank, the funds in the Clerk's registry are property of the estate and subject to a turnover order under either Section 542 or Section 543. Debtors seek no monetary relief in the form of a money judgment from either the Clerk or from Santee Cooper. Debtors seek no retroactive monetary relief against the State of South Carolina or any arm thereof. Instead, debtors seek mandatory and prospective injunctive relief in the nature of a turnover order for specific funds that this Court finds as between the parties to this adversary proceeding are property of the estate. The nature of the relief sought is declaratory (that the funds in the Clerk's registry as between the parties are property of the estate) and prospectively injunctive (that this Court may order those funds transferred into the registry of this Court).

Federal courts have exclusive jurisdiction over property of the estate under 28 U.S.C. § 1334(d), and this Court holds that plaintiffs have shown that the funds in the Clerk's registry are property of the estate and subject to a turnover order under either Section 542 or Section 543.

## II.

The Application of the Eleventh Amendment by the Clerk to a Request for Turnover of the Funds of the Estate Held in the Registry of the State Court.

Defendant, Ms. Brown, contends that the Eleventh Amendment to the United States Constitution bars the federal courts from requiring that funds belonging to a bankruptcy estate be transferred from her custody to the registry of the federal court. Ms. Brown herself maintains these funds in her official capacity as a disinterested stakeholder. The courts of South Carolina and the state of South Carolina have no interest in these funds. They are held pursuant to two writs for prejudgment attachment issued in April 1991 and July 1991. Defendant asserts a general interest of South Carolina in resolving civil complaints on behalf of citizens of South Carolina and preserving assets to satisfy those complaints. Every state necessarily has an interest in the exercise of its laws, including those involving prejudgment attachment. However, the overriding issue is whether the Eleventh Amendment prevents suit against Ms. Brown in federal court to recover the funds.

The Eleventh Amendment to the United States Constitution preserves state sovereign immunity to bar suits against state officers in federal court absent waiver. *Cory v. White*, 457 U.S. 85, 102 S.Ct. 2325, 72 L.Ed.2d 694 (1982). (Eleventh Amendment bars interpleader action against state officials unless violations of federal law are alleged). It is long since resolved that the Eleventh Amendment restricts federal courts from adjudicating a state's interest in property without the consent of the state. *Florida Dep't. of State v. Treasure Salvors, Inc.*, 458 U.S. 670, 102

S.Ct. 3304, 73 L.Ed.2d 1057 (1982). (Eleventh Amendment does not bar admiralty actions against state officials, even when acting in their official capacity but federal courts absent consent may not adjudicate a state's interest in artifacts). However, the Eleventh Amendment remains a bar to any attempt to litigate violations of state law in federal court absent waiver. *Pennhurst State School & Hosp. v. Halderman*, 465 U.S. 89, 104 S.Ct. 900, 79 L.Ed.2d 67 (1984).

The State Assistant Attorney General urges on behalf of Ms. Brown that she is a state official because her office is created under the South Carolina Constitution, she is an elected county official, sums for her salary are paid by the state legislature to Berkeley County to supplement her salary, and she enforces the laws of South Carolina as a county official of the state court system.

Debtor and Citibank do not concede that Ms. Brown is an official of an entity which constitutes an arm of the state. Similarly, this Court has substantial reservations in that regard. The Supreme Court has repeatedly held that the Eleventh Amendment does not apply to " 'counties and similar municipal corporations.' " *Pennhurst State School & Hosp. v. Halderman*, 465 U.S. 89, 123, n. 34, 104 S.Ct. 900, 920, n. 34, 79 L.Ed.2d 67, 93, n. 34 (1984) (quoting *Mt. Healthy City School Dist. v. Doyle*, 429 U.S. 274, 280, 97 S.Ct. 568, 572, 50 L.Ed.2d 471, 479 (1977)). The Supreme Court noted in *Lake Country Estates, Inc. v. Tahoe Regional Planning Agency*, 440 U.S. 391, 401, 99 S.Ct. 1171, 1177, 59 L.Ed.2d 401, 410 (1979) that regarding the Eleventh Amendment, it has "refused to construe the Amendment to afford protection to political subdivisions such as counties and municipalities, even though such entities exercise a 'slice of state power.' " *Moor v. County of Alameda*, 411 U.S. 693, 717–721, 93 S.Ct. 1785, 1799–1802, 36 L.Ed.2d 596, 614–16 (1973); *Lincoln County v. Luning*, 133 U.S. 529, 530, 10 S.Ct. 363, 364, 33 L.Ed. 766, 767 (1890).

Moreover, there is specific authority holding the Eleventh Amendment inapplicable to the counties of South Carolina.

*Scott v. Greenville County,* 716 F.2d 1409, 1422 (4th Cir.1983); *see also Logan v. Shealy,* 660 F.2d 1007, 1015 (4th Cir.1981), *cert. denied,* 455 U.S. 942, 102 S.Ct. 1435, 71 L.Ed.2d 653 (1982); *Lytle v. Commissioners of Election of Union County,* 541 F.2d 421, 426 (4th Cir.1976), *cert. denied,* 438 U.S. 904, 98 S.Ct. 3122, 57 L.Ed.2d 1147 (1978). As noted by the Fourth Circuit in *Scott v. Greenville County,* a state may not "envelope the county in its immunity by express enactment or through the peculiarities of local law ..." *Scott v. Greenville County, supra* at 1422 (citing *Markham v. City of Newport News,* 292 F.2d 711, 716, n. 23 (4th Cir.1961)). Unless payment of a judgment by the county could be said to come directly from the state treasury, no Eleventh Amendment immunity extends to the state. *Wheeler v. Mental Health & Mental Retardation Authority,* 752 F.2d 1063, 1072–73 (5th Cir.1985).

Nevertheless, counsel for Ms. Brown urges that this turnover action should be dismissed because Ms. Brown as Clerk of the Court of Common Pleas of Berkeley County, South Carolina is merely exercising her duties and administering a statewide court system. However, counsel for the defendant offers no case law conferring sovereign immunity on clerks of court of South Carolina. Ms. Brown testified that she is a local, elected official. Her administrative duties are carried out at the direction of the local administrative judge or circuit judge. While each case requires individual consideration, the Fifth Circuit has refused to extend Eleventh Amendment immunity to judges or district attorneys of county criminal courts in Texas. *Crane v. State of Texas, et al.,* 759 F.2d 412, 421 at n. 11 (5th Cir.1985), *cert. denied,* 474 U.S. 1020, 106 S.Ct. 570, 88 L.Ed.2d 555 (1985). (Neither county, nor district attorney are immune from money damages for unconstitutional actions).

Interestingly, in the suits against state clerks of court which this Court was able to find the defendants did not raise the Eleventh Amendment. *Scruggs v. Moellering,* 870 F.2d 376 (7th Cir.1989); *Bright v. McClure,* 865 F.2d 623 (4th Cir.1989); *Finberg v. Sullivan,* 634 F.2d 50 (3rd Cir.1980) (state prothonotary and sheriff subject to suit regarding Pa. postjudgment garnishment). In each of these cases the federal courts went on to find jurisdiction for prospective relief.

Nevertheless, even assuming that Ms. Brown is a state official covered by the sovereign immunity of South Carolina, the doctrine of *Ex parte Young,* 209 U.S. 123, 28 S.Ct. 441, 52 L.Ed. 714 (1908) should apply to bar state officials from ignoring federal laws enacted by the United States Congress. The Supreme Court has concluded that "suits to restrain actions of state officials can, consistently with the constitutional prohibition, be prosecuted only when the action sought to be restrained is without the authority of state law or contravenes the statutes or Constitution of the United States." *Worcester County Trust Co. v. Riley,* 302 U.S. 292, 297, 58 S.Ct. 185, 187, 82 L.Ed. 268, 274 (1937). If the exception to the Eleventh Amendment embodied in *Ex parte Young* has any meaning, it stands for the proposition that a state official must be susceptible to suit in federal court to restrain actions in violation of federal statutes or constitutional law. *Cory v. White, supra; Sterling v. Constantin,* 287 U.S. 378, 53 S.Ct. 190, 77 L.Ed. 375 (1932). While Ms. Brown has not stated that she will resist any order of a United States bankruptcy court or a United States district court to turn over the funds in question, there can be no doubt that her actions in so doing would constitute an obstruction of the federal bankruptcy laws as well as the Supremacy Clause of the United States Constitution.[1]

---

**1.** Ms. Brown has not formally raised judicial or quasi judicial immunity to bar an action against her. However, in *Pulliam v. Allen,* 466 U.S. 522, 104 S.Ct. 1970, 80 L.Ed.2d 565 (1984), state judges were not accorded inherent immunity from prospective injunctive relief or attorneys

fees under suits brought pursuant to 42 U.S.C.A. §§ 1983 and 1988. Seemingly, the availability of suits against state judges eliminates the argument that auxiliary persons whose official position is to aid judges may claim Eleventh Amendment protection. Consequently, Ms. Brown is

### III.

Eleventh Amendment Immunity is Inapplicable Under 11 U.S.C. 106(c) to Injunctive and Declaratory Relief.

 Nevertheless, assuming the Clerk can pose the Eleventh Amendment as a defense to this suit and the *Ex parte Young* exception is not applicable, 11 U.S.C. § 106(c) itself abrogates Eleventh Amendment immunity. This analysis must begin with the Supreme Court's ruling in *Hoffman v. Connecticut Dep't. of Income Maintenance,* 492 U.S. 96, 109 S.Ct. 2818, 106 L.Ed.2d 76 (1989). In *Hoffman* a Chapter 7 trustee for debtors in unrelated bankruptcy cases brought an action against the state for turnover of unpaid amounts due debtors for contractual services rendered to a state entity and for preferential transfer of funds paid to satisfy state taxes.

The trustee relied upon 11 U.S.C. § 106(c) for the proposition that Congress abrogated the state's Eleventh Amendment immunity. While the Supreme Court's analysis of Section 106(c) is more limited than the ultimate holding, the Supreme Court concludes:

> We hold that in enacting § 106(c) Congress did not abrogate the Eleventh Amendment immunity of the States. Therefore, petitioner's actions in United States Bankruptcy Court under §§ 542(b) and 547(b) of the Code are barred by the Eleventh Amendment. Since we hold that Congress did not abrogate Eleventh Amendment immunity by enacting § 106(c), we need not address whether it had authority to do so under its bankruptcy power.

492 U.S. at 104, 109 S.Ct. at 2824, 106 L.Ed.2d at 86.

In the face of the Supreme Court's ruling in *Hoffman,* debtor nonetheless urges that Section 106(c) still operates to abrogate state sovereign immunity for declaratory and injunctive relief. Although defendant urges that the ultimate holding in *Hoffman*

forecloses that contention, the argument has considerable merit upon close analysis.

First, the Supreme Court found that Sections 106(a) and (b) were unequivocal waivers of sovereign immunity by noting that "the narrow scope of waivers of sovereign immunity in §§ 106(a) and (b) make it unlikely that Congress adopted in § 106(c) the broad abrogation of Eleventh Amendment immunity for which petitioner argues." 492 U.S. at 101, 109 S.Ct. at 2822, 106 L.Ed.2d at 84. Although the Court was not faced with and therefore did not reach the issue of whether under Section 106(a) and (b) Congress could bar Eleventh Amendment immunity, the Court recognized Congress' intent to do so.

The Court noted that although Section 106(c)(2) "operates as a further limitation on the *applicability of § 106(c), narrowing the type of relief to which this section applies,*" it continues to allow a bankruptcy court to render a "determination" of an "issue" that "binds governmental units." 492 U.S. at 102–03, 109 S.Ct. at 2822–23, 106 L.Ed.2d at 84–85. (emphasis added). The court, after noting that the language of Section 106(c)(2) was more "indicative of declaratory and injunctive relief," construed Section 106(c) as limiting the ability of a state to assert the Eleventh Amendment immunity:

> [Section 106(c)(2)] echoes the wording of sections of the Code such as § 505, which provides that "the court may determine the amount or legality of any tax," 11 U.S.C. § 505(a)(1), a determination of an issue that obviously should bind the governmental unit but that does not require a monetary recovery from a State. We therefore construe § 106(c) as not authorizing monetary recovery from the States. Under this construction of § 106(c), a State that files no proof of claim would be bound, like other creditors, by discharge of debts in bankruptcy including unpaid taxes, ... but would not be subjected to monetary recovery.

not immune from injunctive suits in federal court by virtue of judicial immunity. *But see Mullis v. United States Bankruptcy Court,* 828 F.2d 1385 (9th Cir.1987); contra *Scruggs v.*

*Moellering,* 870 F.2d 376 (7th Cir.1989) (clerk and judge not entitled to judicial immunity for injunctive relief).

492 U.S. at 102, 109 S.Ct. at 2823, 106 L.Ed.2d at 84–85 (citations omitted).

Clearly, the Supreme Court's construction of Section 106(c) allows a bankruptcy court to bind a state with a determination made under a provision of the Bankruptcy Code notwithstanding Eleventh Amendment immunity. Section 106(c) retains some power to limit Eleventh Amendment immunity, for under the Court's construction of Section 106(c) a "*State* that files no proof of claim would be bound, like other creditors, by discharge of debts in bankruptcy, including unpaid taxes ..." *Id.* (emphasis added).

A determination under Section 106(c) that binds a state must necessarily implicate Eleventh Amendment immunity. *Hoffman* expresses as much by citing case authority (albeit addressing waiver of federal sovereign immunity) for the proposition that state sovereign immunity under the Eleventh Amendment is restricted. 492 U.S. at 102, 109 S.Ct. at 2823, 106 L.Ed.2d at 84–5; *Neavear v. Schweiker,* 674 F.2d 1201, 1204 (7th Cir.1982); *Gwilliam v. United States,* 519 F.2d 407, 410 (9th Cir.1975). If Section 106(c) allows a state to be bound despite the Eleventh Amendment, then Section 106(c) must have some abrogational effect.

It is reasonable to conclude that in *Hoffman* the court was faced with the narrow issue of whether "§ 106(c) authorizes a monetary recovery against a State," *United States v. Nordic Village, Inc.,* —— U.S. ——, ——, 112 S.Ct. 1011, 1014, 117 L.Ed.2d 181, 187 (1992), not whether Congress abrogated a state's sovereign immunity with respect to declaratory or injunctive relief. Consequently, while *Hoffman* contains all encompassing language, it should reasonably be limited to its facts and the precise relief sought by the trustee there.

Were *Hoffman,* however, the only interpretation of Section 106(c) debtors' and Citibank's contentions would be weaker. However, the Supreme Court in *United States v. Nordic Village, Inc.,* —— U.S. ——, 112 S.Ct. 1011, 117 L.Ed.2d 181 (1992), sheds considerable light on the scope of *Hoffman*

and supports the proposition that Section 106(c) limits the Eleventh Amendment. Although *Nordic Village* was a suit for monetary recovery against the United States, the Court in *Nordic Village* limits the facially broad holding in *Hoffman.* Justice Scalia writing for the majority first noted that the language of Section 106(a) and (b) was an "unequivocal expression" of congressional intent to waive sovereign immunity with respect to monetary liability. At ——, 112 S.Ct. at 1015, 117 L.Ed.2d at 188. With respect to Section 106(c), the court noted its continued vitality:

> Next to these models of clarity [§§ 106(a) & (b) ] stands subsection (c). *Though it, too, waives sovereign immunity, it fails to establish unambiguously that the waiver extends to monetary claims.*

At ——, 112 S.Ct. at 1015, 117 L.Ed.2d at 188. (emphasis added). Citing *Hoffman,* the Supreme Court in *Nordic Village* concluded Section 106(c) "permits the bankruptcy court to issue 'declaratory and injunctive'—though not monetary—relief against the Government." *Id.* (citations omitted). The Court explicitly favored this construction because of the familiar distinction established "between suits for monetary claims and suits for other relief." *Id.*

Although *Nordic Village* involved waiver of federal sovereign immunity under Section 106(c) with respect to declaratory and injunctive relief, the Court stated specifically:

> It is true, to be sure, that Congress made clear in § 106 that (insofar as is within Congress's power) State and Federal Sovereigns are to be treated the same for immunity purposes.

At ——, 112 S.Ct. at 1014, 117 L.Ed.2d at 187. Under *Nordic Village,* Section 106(c) therefore retains its vitality to restrict sovereign immunity with respect to declaratory and injunctive relief regarding the federal government. Given Congressional intent that state and federal sovereigns are to be treated identically for immunity purposes, *see* 11 U.S.C. § 101(27) ("governmental unit" means United States or State), it follows that Section 106(c) continues to re-

strict Eleventh Amendment immunity with respect to declaratory and injunctive relief.

Whether Congress possesses the power to abrogate a state's Eleventh Amendment immunity was addressed by the Supreme court in *Pennsylvania v. Union Gas Co.*, 491 U.S. 1, 109 S.Ct. 2273, 105 L.Ed.2d 1 (1989). There, the Court held that the Commerce Clause gave Congress authority to abrogate the Eleventh Amendment. 491 U.S. at 19–23, 109 S.Ct. at 2284–86, 105 L.Ed.2d at 19–22. There exists no basis to distinguish the exercise of Article I powers under the Commerce Clause to restrict the Eleventh Amendment and the exercise of the same powers under the Bankruptcy Clause. *Green v. Mansour*, 474 U.S. 64, 68, 106 S.Ct. 423, 425–26, 88 L.Ed.2d 371, 377 (1985) (Congress may act "pursuant to a valid exercise of power" to abrogate state immunity.); *Fitzpatrick v. Bitzer*, 427 U.S. 445, 96 S.Ct. 2666, 49 L.Ed.2d 614 (1976) (Congressional intent found to eliminate state immunity from suit under Title VII); *Parden v. Terminal Railway*, 377 U.S. 184, 84 S.Ct. 1207, 12 L.Ed.2d 233 (1964) (Court upheld Congressional intent based on Commerce Clause to constructively waive state assertion of immunity from suit under FELA). This Court, therefore, holds that Congress in exercising its power under the Bankruptcy Clause by enacting Section 106(c) abrogated Eleventh Amendment immunity with respect to declaratory and injunctive relief.

## IV.

### The Security of the Funds of the Estate in the State Registry.

As noted, Ms. Brown holds in the Registry of her Court approximately $34,-000,000 on deposit at the South Carolina National Bank. These funds were placed in the Registry of the Court by prejudgment attachment writs issued on April 26, 1991 and July 26, 1991. When deposited in the Registry of the Court, Ms. Brown's Deputy Clerk, Ms. Mildred Hood, conferred with the officials of the South Carolina National Bank and a separate account was opened for these funds. The officials at the South Carolina National Bank placed these funds in a mutual fund comprised of various government securities. The funds were so held until this turnover action was filed on behalf of debtors. Thereafter, on April 20, 1991, after conferring with the officials of the South Carolina National Bank, the funds were transferred to United States government treasury bills. The two treasury bills that were purchased in the amount of $18,000,000 and $14,000,000 mature on May 21, 1992 and May 28, 1992, respectively. The yields on these treasury bills are 3.52% and 3.54%.

It is clear from the testimony that Ms. Brown is a conscientious and responsible Clerk of the Court but has no personal experience or expertise in the investment of funds held in her registry. She relies primarily on her Chief Deputy, Ms. Mildred P. Hood, who previously worked in a bank. Moreover, both county officials appear to rely exclusively on the advice of the bank officer in the local branch of the South Carolina National Bank in Moncks, South Carolina. Most importantly, it is evident from the testimony of Mr. Harvey, the trust officer, that this is the only account of this nature and size which is in the custody and control of either Ms. Brown or the Trust Department of the South Carolina National Bank.

The South Carolina National Bank (the "SCNB") also charges a management fee for administering the funds (the "Funds") held by the South Carolina Clerk. The SCNB calculates the fee it receives for investment of the Funds held by SCNB for the Clerk in accordance with the following scale:

.3% on the first $500,000 of principal invested;

.2% on the next $500,000 to $1,000,000 of principal invested;

.15% on the next $1,000,000 to $8,500,000 of principal invested; and

a negotiated percentage on all amounts of principal invested in excess of $8,500,-000, which the evidence demonstrates was .1% on the approximate sum of $25,-500,000 ($34,000,000—$8,500,000) in this case. The annual fee charged by the

South Carolina National Bank to invest the Funds using this formula is $41,750.

Debtor coal companies and the secured lender Citibank urge that the custodianship of these funds in the Registry of the Circuit Court Clerk of Berkeley County, South Carolina fail to meet the requirements of 11 U.S.C. § 345 which states:

(a) A trustee in a case under this title may make such deposit or investment of the money of the estate for which such trustee serves as will yield the maximum reasonable net return on such money, taking into account the safety of such deposit or investment.

(b) Except with respect to a deposit or investment that is insured or guaranteed by the United States or by a department, agency, or instrumentality of the United States or backed by the full faith and credit of the United States, the trustee shall require from an entity with which such money is deposited or invested—

(1) a bond—

(A) in favor of the United States;

(B) secured by the undertaking of a corporate surety approved by the United States trustee for the district in which the case is pending; and

(C) conditioned on—

(i) a proper accounting for all money so deposited or invested and for any return on such money;

(ii) prompt repayment of such money and return; and

(iii) faithful performance of duties as a depository; or

(2) the deposit of securities of the kind specified in section 9303 of title 31.

(c) An entity with which such moneys are deposited or invested is authorized to deposit or invest such moneys as may be required under this section.

Ms. Brown as Clerk of Court of Berkeley County, South Carolina urges that even if the funds were not previously invested in compliance with Section 345, her actions on April 20 in directing these funds be invested in treasury bills eliminated any problem that might arise under this provision of the Bankruptcy Code.

Based on evidence offered at the hearing, this Court concludes that in fact these funds were not previously invested in compliance with Section 345(a) so as to maximize the reasonable net return on the money taking into account the safety of such deposit or investment. There is no clear evidence as to the nature of the particular government securities in which the monies were previously invested, charges to the account by the fund manager, or rate of return on those funds.

More importantly, the testimony raises substantial questions with regards to the future treatment of these funds. Mr. Harvey, the bank trust officer, testified that following maturity the funds would be reinvested in a money market fund containing only assets of treasury bills. Mr. Harvey was not aware of what fee might be charged by the money market fund itself.

While it would have been a simple matter for Ms. Brown to have directed that these funds be invested and reinvested in treasury bills for the duration of the custody, it is of substantial concern to the Court that both Ms. Brown and Mr. Harvey equate commercial money market funds to direct treasury bill investments. One is directly backed by the full faith and credit of the United States and the other is not. Moreover, an investment in a money market fund even if the fund specializes in government securities, fails to insure against the commercial money market fund's own negligence or defalcation, which is the purpose of Section 345(b)(1) and (2). While it is evident that Ms. Brown could have given such a direction to South Carolina National Bank, there is no evidence before this Court that she did or will in the future.

11 U.S.C. § 345 is crafted by Congress to protect debtor's assets for the creditors by insuring that all investments are either backed by the full faith and credit of the United States or that the trustee require a bond from the entity in which the money is deposited with stringent requirements in favor of the United States, with approval of the corporate surety issued by the United States Trustee, conditioned on rigorous accounting of funds. There is no evidence

as to the scope of any such fidelity bond so as to protect either against negligent or intentional actions of personnel at the bank or at the proposed commercial money market fund.

The procedures in place relevant to the security of the funds, the maximum rate of return as well as the costs attendant to holding such funds in Ms. Brown's registry must be compared with the procedures in place in this Court's registry.

The U.S. Clerk has approximately $1,000,000,000 deposited into the registry of the United States Court for the Southern District of Texas which is invested pursuant to the Court Registry Investment System ("CRIS"). The CRIS was developed by the U.S. Clerk. The funds held by the U.S. Clerk are deposited in connection with approximately 1204 cases pending in the Federal District Courts (including the Bankruptcy Courts) for the Southern District of Texas.

The U.S. Clerk invests the funds held in the registry of the Court in a staggered portfolio of United States treasury securities with a 180 day term. Approximately $40,000,000 of such portfolio securities mature each week and are reinvested immediately in similar United States treasury securities.

The U.S. Clerk uses accounting and brokerage services provided by Texas Commerce Bank as to the United States treasury securities available on a given date, the most advantageous purchase price therefor, and the status thereof. However, the U.S. Clerk purchases the securities directly and the securities are held in book entry form in an account in the name of the U.S. Clerk maintained in the Federal Reserve Bank itself.

Interest earned on the investments of such funds is credited weekly to the amount of funds deposited with respect to a case. The Clerk's most recent investment in United States treasury securities with a 180 day term earns an interest rate of 3.98%.

For the accounting and brokerage services provided by Texas Commerce Bank, the U.S. Clerk pays a fee of $8.50 per transaction and a fee of twenty basis points of the interest earned by an investment. Using the 3.98% interest rate, the net rate of interest earned on funds recently invested is 3.78%.

The U.S. Clerk also charges a fee for the management of funds deposited in connection with a case in accordance with guidelines and fee schedules promulgated by the Judicial Conference of the United States and codified at 56 Fed.Register 56356–01, dated November 4, 1991. Pursuant to the schedule of fees, for the first $100,000,000 on deposit for an account the Clerk charges the sum of 10% of the annual interest earned by such sum. A party to a case may petition the Director of the Administrative Office of the United States District Court for the Southern District of Texas for a reduction of this fee by submitting a letter stating the reasons thereof. If the 10% fee, the net interest rate of 3.78%, and the principal amount of the Funds to be invested of $34,000,000 are used, the annual amount that would be charged by the U.S. Clerk on the approximately $34 million held by the Defendant is approximately $128,520. The fees charged by the U.S. Clerk may be recoverable as costs by the prevailing party. Debtors represented they would petition the Director to reduce the fees.

Through rolling over its investment on a weekly basis, the U.S. clerk is able to react swiftly to changes in interest rates. In the event that the Funds in this proceeding would be paid out in its entirety, it is not likely that the U.S. Clerk would have to sell any investments before their maturity to cover the payment. Consequently, it is unlikely that the U.S. Clerk (or the party receiving the Funds) would suffer a loss on the investment of the Funds in question by having to sell the securities in which such funds are invested at a discount because of higher prevailing interest rates.

The U.S. Clerk has substantial experience in investing the Funds in United States treasury securities. The U.S. Clerk is accustomed to investment of funds held for an indeterminate duration in an investment system that combines the safety of

United States treasury securities with the benefits of immediate liquidity and the minimization of market risk due to fluctuations in interest rates.

The CRIS developed by the U.S. Clerk is nationally recognized as a safe and proven system for maximizing the return of investments requiring maximum safety. Presently, ten federal districts rely upon the U.S. Clerk to maintain and invest their deposits for pending cases.

Although the SCNB charges a smaller fee than the U.S. Clerk would appear to charge to administer the Funds, such difference is substantially, if not fully, offset by the increased earnings which accrue if the Funds are invested by the U.S. Clerk in the CRIS. The annual interest earnings which would accrue if the U.S. Clerk invested the Funds at 3.78% would be approximately $1,285,200, while the annual interest earned if the Funds were invested by the Clerk of the Court of Berkeley County, South Carolina in the U.S. Securities presently invested at 3.53 and 3.54 percent would be approximately $1,200,200. Consequently, using the existing interest rates earned by the U.S. Clerk and SCNB, any differential between the fees charged by the SCNB and the U.S. Clerk will be substantially eliminated by the increased investment return realized by the U.S. Clerk based upon existing market rates. Moreover, if debtors are able to successfully petition the Director of Administrative Office to reduce the 10% charge, the true cost (fees plus interest paid on the investment of the Funds) of investing the Funds by the U.S. Clerk will decline and could be substantially lower than the cost of investing such funds through the SCNB.

The Court finds that the investment of the Funds by the U.S. Clerk offers the safest investment of the Funds because the U.S. Clerk maintains control over such funds in its own account with the Federal Reserve Bank. Further, the U.S. Clerk receives accounting information on the accounts it administers weekly, compared to reports received by the South Carolina Clerk in the latter half of the month following the month of activity.

The U.S. Clerk's CRIS minimizes market risk given its size, investment strategy, and liquidity. The SCNB has no similar flexibility, and its account maintained for the State Clerk is unique among SCNB's accounts.

The U.S. Clerk has had no accounting or other problems in maintaining these accounts. The U.S. Clerk is otherwise subject to the Federal Tort Claims Act for any misapplication or misappropriation of funds. The remedies available against the South Carolina Clerk or SCNB are unknown or uncertain.

 At the hearing before this Court, it was urged that Federal Rule of Bankruptcy Procedure 9027(i) pertaining to attachment or sequestration barred debtors from compelling this turnover action. In response, debtors and Citibank correctly note that Rule 9027(i) relates to a removal action, which is not before this Court. Instead, at issue are funds which this Court concludes are property of the estate and therefore subject to a turnover action under Sections 542 or 543 in which debtors and Citibank assert that the funds are not being protected as required by 11 U.S.C. § 345. The provisions of the Bankruptcy Rules may not override the provisions of the Code. Given that the resolution of the pending claims between debtors and Santee Cooper are uncertain at this time, this Court must adhere to its responsibilities under 11 U.S.C. § 345.

For these reasons, this Court concludes that it should direct that Mary P. Brown, Clerk of the Court for Berkeley County, South Carolina, turn over the funds in the custodial account in the South Carolina National Bank to Jesse E. Clark, Clerk of the United States Court for the Southern District of Texas for placement into the Registry of this Court.

It is hereby ORDERED that the Clerk of the Court of Berkeley County, South Carolina shall immediately turn over all funds in the approximate amount of $34 million held in the registry pursuant to two warrants of attachment issued in the case styled and numbered *South Carolina Public Service Authority v. Great Western*

*Coal (Kentucky), Inc., et al,* Case No. 90–CP–08–1760, to the Clerk of the United States District Court for the Southern District of Texas for deposit of the Funds into the registry of the Court. The rights of any party to those funds will not be altered by this turnover order.

It is further ORDERED that Great Western (Kentucky), Inc. and Great Western Coal, Inc. are hereby ORDERED to petition Ralph Mecham, Director of the Administrative Office of the United States, to reduce the fee charged as a percentage of the interest earned by the funds deposited into the registry of the Bankruptcy Court.