50 F.3d 877
 Dennis J. D'AGUANNO, John William McVeigh, Christine S.
Webster, Wesley Keith Coleman, Plaintiffs-Appellants,
v.
Walter J. GALLAGHER, individually, Kenneth E. Kinzler, Jr.,
individually, Robert A. Pasteur, individually,
Miguel A. Vasquez, individually, Hector
Ramirez, III, Defendants-Appellees.
 No. 93-3097.
 United States Court of Appeals,
Eleventh Circuit.
 March 29, 1995.
 
 James M. Russ, Orlando, FL, Nina E. Vinik, Miami, FL, Helaine M. Blum, Legal Aid, Orlando, FL, for appellants.
 Jeffrey G. Slater, Eubanks, Hilyard, Rumbley, Meier & Lengauer, Orlando, FL, for appellees.
 Appeal from the United States District Court for the Middle District of Florida.
 Before EDMONDSON and CARNES, Circuit Judges, and HAND*, Senior District Judge.
 EDMONDSON, Circuit Judge:
 
 
 1
 This appeal is from a decision granting defendants' motion for summary judgment in a suit pursuant to 42 U.S.C. Sec. 1983 for alleged civil rights violations. We affirm in part and vacate in part.
 
 FACTS
 
 2
 Appellants, Dennis J. D'Aguanno, John W. McVeigh, Christine S. Webster, and Wesley K. Coleman, are four homeless people who lived in shelters they had built in a "homeless campsite" on undeveloped, private property in Orange County, Florida. At the same time, defendant Walter Gallagher was the Sheriff of Orange County, and defendants Kenneth E. Kinzler, Jr., Robert A. Pasteur, Miguel A. Vazquez, and Hector Ramirez were deputy sheriffs. Invoking 42 U.S.C. Sec. 1983, plaintiffs sued each defendant in his individual capacity for alleged civil rights violations. Plaintiffs also alleged that defendants violated state constitutional law.
 
 
 3
 The land upon which plaintiffs had built their shelters was owned by Rhoda Bouzek and managed by Gus Miller. Ms. Bouzek and Mr. Miller both stated that they did not know plaintiffs were living on the property and never gave permission or consent for any person to live on or to use the property. In affidavit, Ms. Bouzek said that she did not want people on her property and that she was grateful that defendants had worked to help keep people ("trespassers" in her view) off her property.[1] Although plaintiffs claim they never saw "no trespassing" signs posted on the property, Mr. Miller stated that he had placed "no trespassing" signs on the property many times; but the signs were removed. Throughout the time plaintiffs occupied the property, defendant deputies visited the campsite at least once a month and routinely requested identification from the plaintiffs. Although D'Aguanno claims defendants never told him to leave the campsite, defendants repeatedly told McVeigh, Webster, and Coleman to leave the property. Defendants ultimately entered the campsite and removed plaintiffs' shelters and personal property.
 
 
 4
 Plaintiffs then sued defendants, alleging that defendants violated their rights secured by the United States Constitution. Plaintiffs also asserted claims for violations of the Florida Constitution. Plaintiffs argued that defendants did not have the legal authority to force them to leave; and plaintiffs sought declaratory relief, injunctive relief, monetary damages, attorneys' fees, and litigation costs. Defendants responded that their act of removing plaintiffs' shelters and personal belongings from the property was taken based on their belief that plaintiffs were trespassing on private property.
 
 
 5
 The district court granted defendants' motion for summary judgement on all of plaintiffs' causes of action, 827 F.Supp. 1558. The court concluded that defendants were entitled to qualified immunity on plaintiffs' claims for violations of plaintiffs' rights to peaceable assembly, freedom of association, due process of law, and to be free from unreasonable searches and seizures under both the federal and state constitutions. On the claims that defendants violated plaintiffs' rights to equal protection of the law and to be free from cruel and unusual punishment, the district court concluded that plaintiffs failed to state a claim upon which relief could be granted.[2]
 
 
 6
 Because qualified immunity is a defense only to federal claims, we hold that the district court erred in concluding that defendants were entitled to qualified immunity on the claims for violations of state law. See Andreu v. Sapp, 919 F.2d 637, 640 (11th Cir.1990). And, because qualified immunity is a defense only to claims for monetary relief, the district court erred in granting summary judgment on plaintiffs' claims for injunctive and declaratory relief. See Fortner v. Thomas, 983 F.2d 1024 (11th Cir.1993). We vacate and remand that portion of the district court's judgment granting defendants summary judgment on these issues. We address in more detail only the issue of whether the district court properly concluded that defendants were entitled to qualified immunity on the federal claims for monetary damages. The district court's decision that defendants were entitled to qualified immunity is reviewed de novo. James v. City of Douglas, 941 F.2d 1539 (11th Cir.1991).
 
 QUALIFIED IMMUNITY
 
 7
 Government actors performing discretionary functions are entitled to qualified immunity from civil trials for money damages and may not be held liable in their individual capacity "if their conduct violates no 'clearly established statutory or constitutional rights of which a reasonable person would have known.' " Lassiter v. Alabama A & M Univ., 28 F.3d 1146, 1149 (11th Cir.1994) (en banc) (quoting Harlow v. Fitzgerald, 457 U.S. 800, 818, 102 S.Ct. 2727, 2738, 73 L.Ed.2d 396 (1982)). No one disputes that defendants were performing discretionary functions when the alleged constitutional violations occurred. Therefore, to overcome defendants' qualified immunity defense, plaintiffs must establish that defendants' conduct violated " 'clearly established statutory or constitutional rights of which a reasonable person would have known.' " Id. Applying this principle, we now consider each of the federal constitutional claims.
 
 
 8
 A. Damage Claim on Right to Peaceable Assembly and Freedom of Association:
 
 
 9
 Plaintiffs allege that, in removing them from the property, defendants violated plaintiffs' rights to peaceable assembly and freedom of association guaranteed in the First Amendment. To show that these rights were clearly established, plaintiffs rely mainly upon the Supreme Court's decisions in Coates v. City of Cincinnati, 402 U.S. 611, 91 S.Ct. 1686, 29 L.Ed.2d 214 (1971), and Roberts v. United States Jaycees, 468 U.S. 609, 104 S.Ct. 3244, 82 L.Ed.2d 462 (1984). In Roberts, the Court recognized "as implicit in the right to engage in activities protected by the First Amendment a corresponding right to associate with others in pursuit of a wide variety of political, social, economic, educational, religious, and cultural ends." Id. at 622, 104 S.Ct. at 3252. While those cases recognized a general First Amendment right to peaceable assembly and freedom of association, they did not clearly establish that people have a right to pursue such ends on the property of another without the owner's permission.
 
 
 10
 To overcome the qualified immunity defense, citing precedent which establishes a general right will not do. Because those cases plaintiffs cite do not dictate and compel the conclusion that defendants' acts violated plaintiffs' rights to peaceable assembly and freedom of association, and because plaintiffs have failed to cite other authority which dictates that conclusion, plaintiffs have failed to show defendants violated clearly established federal law of which a reasonable officer would have known. The district court, therefore, properly held defendants were entitled to qualified immunity on plaintiffs' First Amendment claims.[3]
 
 B. Damage Claim on Right to Privacy:
 
 11
 Plaintiffs also allege that, in searching their persons and property without a warrant, defendants violated the right to privacy and the right to be secure from unreasonable searches and seizures guaranteed by the Fourth Amendment. To invoke the protection of the Fourth Amendment, plaintiffs must show that they had a subjective expectation of privacy that society, at the time, was prepared to recognize as reasonable.
 
 
 12
 While the facts establish that plaintiffs might have had a subjective expectation of privacy in their shelters and personal property, no case law is advanced to establish clearly that society recognized plaintiffs' expectation of privacy as reasonable under the facts of this case. Although plaintiffs cite several cases which recognize a general right to privacy, the facts of those cases are too different to show that plaintiffs' right to privacy was clearly established in the context of a case like this one. Those cases address a person's right to privacy and freedom from search and seizure when he resides or stores his belongings at another's residence or on another's property with the landowner's permission or in public places.[4] Plaintiffs have cited no authority which recognizes a person's right to privacy when he lives or stores his belongings on private property without the landowner's permission.[5] The district court, therefore, properly concluded that defendants were entitled to qualified immunity on this issue.
 
 C. Damages Claim on Due Process of Law:
 
 13
 Plaintiffs claim that, in destroying their shelters and personal property without first notifying them and providing them an opportunity for a hearing, defendants violated plaintiffs' right to due process of law guaranteed by the Fifth Amendment. To show that their right to due process was clearly established, plaintiffs rely mainly on Fuentes v. Shevin, 407 U.S. 67, 92 S.Ct. 1983, 32 L.Ed.2d 556 (1972).[6] Fuentes stands for the general proposition that the Fifth Amendment requires notice and an opportunity to be heard before the government deprives a person of his property. Such a general assertion of one's constitutional rights, however, is insufficient to overcome a qualified immunity defense. The Supreme Court explained:
 
 
 14
 [T]he right to due process of law is quite clearly established by the Due Process Clause, and thus there is a sense in which any action that violates that Clause (no matter how unclear it may be that the particular action is a violation) violates a clearly established right. Much the same could be said of any other constitutional or statutory violation. But if the test of "clearly established law" were to be applied at this level of generality, it would bear no relationship to the "objective legal reasonableness" that is the touchstone of Harlow. Plaintiffs would be able to convert the rule of qualified immunity ... into a rule of virtually unqualified liability simply by alleging [a] violation of extremely abstract rights.
 
 
 15
 Anderson v. Creighton, 483 U.S. 635, 639, 107 S.Ct. 3034, 3039, 97 L.Ed.2d 523 (1987).
 
 
 16
 Plaintiffs, then, must show that their right to due process was clearly established given the particular facts of this case. Plaintiffs have cited no authority that clearly states the circumstances in which homeless persons retain a property interest in the shelters they erect or whether homeless persons retain a property interest in shelters erected and property stored, without permission, on private property. The district court, therefore, properly concluded that defendants were entitled to qualified immunity on plaintiffs' due process claim.
 
 D. Availability of Costs and Fees:
 
 17
 In the light of the complaint's prayers for relief, defendants asserted the qualified immunity defense. A question has been presented in this appeal about whether the monetary damages which the defense of qualified immunity bars include plaintiffs' claims for costs, expenses of litigation, and attorneys' fees.[7] The answer is "yes." We hold that, for qualified immunity purposes, the term "damages" includes costs, expenses of litigation, and attorneys' fees claimed by a plaintiff against a defendant in the defendant's personal or individual capacity.
 
 
 18
 In the present case, these kinds of monetary claims might follow from plaintiffs having a successful outcome (if they do) on their federal-law-based demands for injunctive and declaratory relief. Nowadays, such sums can be substantial, often in excess of a plaintiff's other damages. The policy that supports qualified immunity--especially removing for most public officials the fear of personal monetary liability--would be undercut greatly if government officers could be held liable in their personal capacity for a plaintiff's costs, litigation expenses, and attorneys' fees in cases where the applicable law was so unsettled that defendants, in their personal capacity, were protected from liability for other civil damages.
 
 
 19
 Title 42 U.S.C. Sec. 1988, as amended by the Civil Rights Attorneys' Fees Awards Act of 1976, provides in part:In any action or proceeding to enforce section[ ] ... 1983 ... the court, in its discretion, may allow the prevailing party, other than the United States, a reasonable attorney's fee as part of the costs.
 
 
 20
 42 U.S.C. Sec. 1988 (1976).
 
 
 21
 The amended statute was largely a response to Alyeska Pipeline Service Co. v. Wilderness Society, 421 U.S. 240, 95 S.Ct. 1612, 44 L.Ed.2d 141 (1975), a decision which limited judicial power to award attorneys' fees. See S.Rep. No. 94-1011, p. 1, 4 (1976) U.S.Code Cong. & Admin.News 1976 at pp. 5908, 5911, 5912. Still, as the Senate Committee Report shows, Congress did not foresee or require the award of fees against government officers, sued in their individual capacity, when the officers avoided acting in bad faith. The legislative history reveals from whom attorneys' fees may be collected pursuant to section 1988:
 
 
 22
 [I]t is intended that the attorney's fees, like other items of costs, will be collected either directly from the official, in his official capacity,* from funds of his agency or under his control, or from the State or local government (whether or not the agency or government is a named party).
 
 
 23
 Id. at p. 5 U.S.Code Cong. & Admin.News 1976 at pp. 5908, 5913. (emphasis added) (all but one footnote deleted).
 
 
 24
 The footnote adds a lot: "Proof that an official had acted in bad faith could also render him liable for fees in his individual capacity...." Id. at p. 5, n. 7 U.S.Code Cong. & Admin.News 1976 at p. 5913. The significance of these legislative materials is that a defense of good faith was understood by Congress--even when liberalizing the law of fees--to be a valid shield for defendants on awards of attorneys' fees to plaintiffs. And, just two years after section 1988 was amended about fees, the Supreme Court also recognized that "[a]wards against the official in his individual capacity ... were not to be affected by the statute; ... they would continue to be awarded only 'under the traditional bad faith standard recognized ... in Alyeska.' " Hutto v. Finney, 437 U.S. 678, 699-700, 98 S.Ct. 2565, 2578, 57 L.Ed.2d 522 (1978). Again, good faith barred fee awards against individuals. With the Harlow v. Fitzgerald, 457 U.S. 800, 102 S.Ct. 2727, 73 L.Ed.2d 396 (1982), decision, good faith became an objective as opposed to a subjective standard. But, under Harlow and its progeny, qualified immunity continues to be good faith immunity. Id. at 815, 102 S.Ct. at 2736 ("Qualified or 'good faith' immunity is an affirmative defense...."). Put differently, if a defendant has qualified immunity for damages, the defendant has good faith immunity for the purposes of fees and so on.
 
 
 25
 Because section 1988, especially when read in the light of its legislative history, requires no award of costs, litigation expenses, or attorneys' fees from defendants in their personal capacity[8] and because the policy underlying qualified immunity would in no way be advanced by the award of such costs and fees against defendants in their personal capacity, we hold that such awards, even in actions for injunctive and declaratory relief, are barred when the defendant's conduct meets the objective good faith standard encompassed by the qualified immunity doctrine.[9]
 
 
 26
 AFFIRMED in part, VACATED in part, and REMANDED.APPENDIX
 
 United States District Court
 Middle District of Florida
 Orlando Division
 DENNIS J. D'AGUANNO, JOHN WILLIAM
 MCVEIGH, CHRISTINE S. WEBSTER AND
 
 27
 WESLEY KEITH COLEMAN,
 
 
 28
 Plaintiffs,
 
 
 29
 -VS-
 
 
 30
 WALTER J. GALLAGHER, INDIVIDUALLY,
 
 
 31
 KENNETH E. KINZLER, JR., INDIVIDUALLY,
 
 
 32
 ROBERT A. PASTEUR, INDIVIDUALLY,
 
 MIGUEL A. VAZQUEZ, INDIVIDUALLY AND
 
 33
 HECTOR RAMIREZ, III, INDIVIDUALLY,
 
 
 34
 Defendants.
 
 Case No: 92-991-CIV-ORL-18
 AFFIDAVIT
 
 35
 STATE OF FLORIDA,
 
 COUNTY OF ORANGE, SS:
 
 36
 BEFORE ME, the undersigned authority, duly authorized to administer oaths, personally appeared RHODA BOUZEK and upon being duly sworn by me deposes and says as follows:
 
 
 37
 1. My name is RHODA BOUZEK and I am over the age of 18 years and have personal knowledge of the information contained herein.
 
 
 38
 2. I reside at 7940 Redwood Lane, Parkland, Florida 33067. I am the owner of the home and real property located at 7940 Redwood Lane, Parkland, Florida.
 
 
 39
 3. In addition to owning the above-described property at Redwood Lane I own other real property in Orange County, Florida. Included in the other real property owned by me and others is a piece of land located in a wooded area west of 1730 Forsyth Road near East Highway 50 in Orange County, Florida. I am one of the owners and act as trustee for all owners of said parcel of land. I have been a partial titleholder and trustee for said property since 1987. The size of that piece of land is approximately 14 acres. That piece of property is unimproved and contains no permanent structures. Neither has there ever been on this land any temporary structures, residential or otherwise, which have been there with my permission and consent as the owner of the property.
 
 
 40
 4. At no time have I ever given my permission or consent for any person(s) to reside, live, establish housekeeping or stay upon my property located off of Forsyth Road near East Highway 50. Nor did I at any time give my permission or consent for any person(s) to use the property. I never gave my permission or consent for any person(s) to erect a home, shelter, shed or other structure on the property.
 
 
 41
 5. I am unaware of ever having met or communicated with Dennis J. D'Aguanno, John William McVeigh, Christine S. Webster or Wesley Keith Coleman. To the extent that any of these persons were on my property at Forsyth Road near East Highway 50 in Orange County, Florida, it was without my consent, permission or knowledge. Any use of the property by Dennis J. D'Aguanno, John William McVeigh, Christine S. Webster or Wesley Keith Coleman for any purpose, including residence or shelter, was without my consent, permission or knowledge.
 
 
 42
 6. I do not wish to have my property occupied and used by persons without my consent or permission and am grateful to law enforcement officers whom have worked to keep people from my property and work to keep people from my property who are upon it without my permission and consent.
 
 
 43
 7. Any persons upon the parcel of land located off Forsyth Road near East Highway 50 in Orange County, Florida, at any time were trespassers upon said property.
 
 
 44
 FURTHER AFFIANT SAYETH NOT.
 
 
 45
 /s/ Rhoda Bouzek
 
 
 46
 Rhoda BouzekNOTE: OPINION CONTAINS TABLE OR OTHER DATA THAT IS NOT VIEWABLE
 
 
 
 *
 Honorable W.B. Hand, Senior U.S. District Judge for the Southern District of Alabama, sitting by designation
 
 
 [1]
 The full text of the affidavit is set out in an appendix to this opinion
 
 
 [2]
 Because plaintiffs do not constitute a suspect class and failed to prove that defendants' acts were unrelated to a permissible government objective, we conclude that the district court did not err in granting defendants summary judgement on the claims for violations of the right to equal protection of the laws. Kite v. Marshall, 661 F.2d 1027, 1030 (5th Cir.1981). The cruel and unusual punishment clause only protects people who have been convicted of a crime. Whitley v. Albers, 475 U.S. 312, 317-18, 106 S.Ct. 1078, 1083, 89 L.Ed.2d 251 (1986). We affirm the district court's judgement on these issues without further discussion
 
 
 [3]
 Plaintiffs also rely upon Wilson v. Taylor, 733 F.2d 1539 (11th Cir.1984), and Sawyer v. Sandstrom, 615 F.2d 311 (5th Cir.1980), to prove their First Amendment rights were clearly established. Those cases, however, are not sufficiently similar to this one to give the defendants notice that plaintiffs retained the rights to peaceable assembly and freedom of association while living on private property without the permission of the owner
 
 
 [4]
 See Minnesota v. Olson, 495 U.S. 91, 110 S.Ct. 1684, 109 L.Ed.2d 85 (1990) (overnight house guest had legitimate expectation of privacy in his host's home); U.S. v. Forker, 928 F.2d 365 (11th Cir.1990) (right to privacy of persons living in motel rooms); O'Connor v. Ortega, 480 U.S. 709, 107 S.Ct. 1492, 94 L.Ed.2d 714 (1987) (employee's expectation of privacy in his office); and Katz v. United States, 389 U.S. 347, 88 S.Ct. 507, 19 L.Ed.2d 576 (1967) (right to privacy in conversations from a public telephone booth)
 
 
 [5]
 While one district court in Florida has said that society is willing to recognize a homeless person's expectation of privacy in his personal belongings, plaintiffs have cited no authority sufficient to show that expectation of privacy is reasonable in a situation where people and their belongings are on the property of another without the landowner's permission. Moreover, a district court decision cannot establish constitutional rights for qualified immunity purposes. See Muhammad v. Wainwright, 839 F.2d 1422, 1425 (11th Cir.1987)
 
 
 [6]
 The remaining cases on which plaintiffs rely do not come from the U.S. Supreme Court, the Eleventh Circuit Court of Appeals, or the Florida Supreme Court and, therefore, cannot show that plaintiffs' right to due process was clearly established. See Courson v. McMillian, 939 F.2d 1479, 1498, n. 32 (11th Cir.1991)
 
 
 [7]
 It bears reiteration that this opinion deals with claims against defendants in their individual capacity. Also, this appeal presents no question about the power of the courts to award fees, expenses of litigation, or costs where the defendants in the conduct of the underlying section 1983 or similar litigation have acted unreasonably, causing the plaintiffs or the courts unnecessary trouble and expense; we, therefore, say nothing about that issue. But, in cases involving the qualified immunity defense, no court should award fees or costs against a defendant in his individual capacity without first making clear with particularity the unreasonable conduct during the litigation that supports the award
 
 
 [8]
 Rule 54(d) of the Federal Rules of Civil Procedure also is not truly mandatory on the matter of allowing costs
 
 
 [9]
 Plaintiffs cite Pulliam v. Allen, 466 U.S. 522, 104 S.Ct. 1970, 80 L.Ed.2d 565 (1984) (5 to 4 opinion), for the proposition that qualified immunity provides no defense to claims for costs and attorneys' fees. But Pulliam decided nothing about the qualified immunity doctrine. Pulliam involved a common-law immunity, absolute judicial immunity. These two kinds of immunity are different
 Judicial immunity protects even knowingly wicked conduct, so long as it is done in the scope of judicial duties. That members of the Supreme Court and Congress would limit such iron-clad, absolute immunity as much as history would permit is understandable. In contrast, qualified immunity only protects government officials whose conduct was, in the light of federal law, reasonable. As a consequence, we think a judicial officer, in the right case, might be absolutely immune to suit for damages and, also, have qualified immunity on the question of attorneys' fees, although judicial immunity would not have barred the fees.